**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ARNOLD J. HILL,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 16-1476 (JEB)** |
| **UNITED STATES PAROLE COMMISSION,** *et al.*, | |
| **Defendants.** | |

<u>**MEMORANDUM OPINION**</u>

Having spent the last thirty years locked up for strangling an ex-girlfriend, Plaintiff Arnold Hill is eager to get out. In bringing this action, he asserts that the U.S. Parole Commission has unfairly blocked his release in a number of ways, including by failing to give him notice about testimony from the victim's family, treating him (a District of Columbia offender) differently from federal prisoners, and rescinding a prior parole grant. Although a further rehearing is now set for November 2018, Hill is unwilling to linger any longer in limbo. He has thus filed suit against the USPC and its three Commissioners in their official capacities, seeking various forms of injunctive and declaratory relief.

Defendants now move to dismiss, contending that Plaintiff's claims that the proceedings violated due process and equal protection and reached an arbitrary result cannot break the parole cycle. This is so. Because Hill's only avenues to relief involve a further parole hearing or filing a habeas petition, the Court will grant the Government's Motion and dismiss the case.

## I.    Background

Hill is an inmate in his mid-sixties serving time for murdering his ex-girlfriend, Shelby Teresa Duncan, in September 1987.  See Mot., Exh. 1 (Sentence Monitoring Computation Data) at 1.  For that crime, the District of Columbia Superior Court sentenced him to an indefinite term of imprisonment of twenty years to life.  Id.  Under the District's old sentencing scheme, this meant that Hill would first be eligible for parole after serving the bottom number — *i.e.*, twenty years — and could not serve longer than the top number, which, in this case, was redundant since it was life.  See Warren v. U.S. Parole Comm'n, 659 F.2d 183, 196 (D.C. Cir. 1981) ("Under the penal theory behind the parole system, [a] sentence [i]s deliberately designed to be indeterminate within a broad range so that the precise date of his release could be determined by the best professional judgment [of parole authorities] available at the time of his release as to his prospects for a law-abiding life, among other things.").  All told, Plaintiff has now been incarcerated for this murder for almost thirty years.  See Computation Data at 2.

Given his twenty-to-life term, Hill first became parole eligible in October 2007.  Id. Although he had been sentenced in a D.C. court for a D.C. Code offense, the U.S. Parole Commission handled his case, as Congress had abolished the D.C. Board of Parole, largely done away with local parole, and transferred jurisdiction to the Commission for remaining offenders by enacting the National Capital Revitalization and Self-Government Improvement Act of 1997, Pub. L. No. 105-33, § 11231, 111 Stat. 712, 745 (codified at D.C. Code §§ 24-101 *et seq.*).  Over time, the Commission would consider Hill's eligibility on numerous occasions, as it is required to do.  See 28 C.F.R. § 2.75(a)(2)(i) (requiring hearings at least every five years where "offense behavior resulted in the death of a victim").

A. Hearings & Rehearings

The Commission initially conducted a hearing in July 2007 and denied release after finding that Hill's parole guidelines recommended at least 26 years' imprisonment. See Mot., Exh. 3 (August 7, 2007, Notice of Action). The agency then scheduled a rehearing for July 2012. Id.

Apparently realizing thereafter that it should have applied the D.C. Board of Parole's so-called "1987 Guidelines," not the federal ones, the Commission conducted a rehearing earlier than scheduled in November 2009. Id., Exh. 4 (December 17, 2009, Notice of Action); see ECF No. 1 (Complaint), ¶¶ 33-34; see also 28 C.F.R. § 2.80(o)(1) (making applicable "1987 guidelines of the former District of Columbia Board of Parole"). The correct Guidelines recommended current parole, as opposed to at least several more years' imprisonment, but the Commission nonetheless denied release, instructed Hill to complete his GED and a 500-hour drug-abuse program, and then set a further rehearing a year later. See 2009 Notice of Action.

That second rehearing took place in November 2010. See Mot., Exh. 5 (February 11, 2011, Notice of Action). This time, despite a Guidelines recommendation of release (again) and his compliance with rehabilitative programs, the USPC again denied parole. Id. It informed Hill that "there is a reasonable probability that you would not obey the law if released and your release would endanger the public safety." Id. More specifically, he was a "more serious parole risk" than the Guidelines suggested because: he was "involved in the strangulation of the victim, following [his] harassment of her due to the relationship ending," "[t]he victims' nude body was discovered by her children," and he had "two previous convictions which appear violent in nature, Assault & Battery and Unlawful Wounding," the details of which had not been fleshed out in previous proceedings. Id. Another rehearing was then scheduled in one year's time. Id.

The third rehearing in November 2011 seemed, at first, to be the charm. The Commission granted parole and set an effective release date of August 7, 2012. Id., Exh. 6 (January 11, 2012, Notice of Action). In doing so, it informed Hill that the "parole effective date is contingent upon approval of your release plan by the Commission." Id. (citing 28 C.F.R. § 2.82); see 28 C.F.R. § 2.83.

Would that it were so simple. Come February 2012, the USPC learned that Duncan's family members wished to testify. Id., Exh. 9 (July 25, 2012, Hearing Summary). When the Commission receives "new and significant information concerning the prisoner," 28 C.F.R. § 2.75(e) (citing § 2.28), including "adverse information," id. § 2.28(f), it may reopen any case for a special reconsideration hearing. That process begins with one Commissioner's recommending reconsideration to the others; this referral "automatically retard[s] the prisoner's scheduled release date until a final decision is reached in the case." Id. § 2.28(f). If two Commissioners concur in a reopening, then a new hearing is set. Id. That is what happened here. See Mot., Exh. 7 (February 15, 2012, Notice of Action).

In the subsequent, fourth rehearing in July 2012, an examiner heard testimony from Duncan's sister and eldest daughter. The sister mentioned how Hill had never given specifics about how or why he killed Duncan. See 2012 Hearing Summary at 2. And the daughter discussed how she and her two siblings (10, 6, and 4 years of age back then) were at home during the crime and how the youngest one discovered their mother's body the next morning. Id. at 1, 3. She also testified that Hill had previously threatened to kill Duncan. Id. at 1. Finally, she objected to his plan to live nearby, in the same Maryland county in which she resided, once released. Id. at 1. Plaintiff was not represented, but apologized and testified that he did not

remember how or why he strangled Duncan, both because the events occurred some 25 years ago and because he may have been on drugs. Id. at 2.

The hearing examiner recommended against release, or, in other words, he advocated for rescinding the initial parole grant. He recounted how, at the hearing, Hill "never really displayed any remorse" and was "very methodical," and was "a bit evasive" about "remember[ing] details of the offense" and "just did not want to bring them up." Id. The examiner found it "unimaginable to kill the mother of these young children and then to walk out and leave a lifeless strangulated body in her apartment knowing full well that sometime the body would be discovered by the three children who were residing in the bedroom next to the mother's bedroom." Id. at 3. Given that this "total disregard for the victim in this case and the safety of her children [wa]s so egregious," he concluded that there is a "reasonable probability" he would not obey the law and that release would "endanger public safety." Id. (noting "level of violence and the complete disregard for the victim's children"). The Commission agreed and scheduled the next rehearing in five years' time — that is, in July 2017. Id., Exh. 8 (August 29, 2012, Notice of Action).

Not even this settled things for long. In September 2015, Plaintiff's counsel asked the Commission to reopen the case once again. Id., Exh. 10 (September 30, 2015, Letter from Chanale Fiebig to Hon. J. Patricia Wilson Smoot). In particular, Hill argued that he had not received notice of the nature of the testimony from Duncan's family (thereby impairing his preparation and retention of legal representation), and he had recently developed an alternate release plan to live in a different county in Maryland. Id. at 2-4. This was to no avail, as the Commission rejected his plea. Id., Exh. 11 (February 2, 2016, Memorandum). It reasoned that, "at the outset of the hearing, the Examiner asked Mr. Hill if was aware that victims would be

testifying and he said that he was" and that Hill "also informed the Examiner that he was aware of his right to have a person of his choice represent him but did not want a representative." Id. The Commission then found that "the fact that he now has a release plan that is outside of the county where the victims live" was not so "significant as to warrant earlier parole reconsideration." Id.

B. This Lawsuit & Another Rehearing

Hill responded by filing this lawsuit in July 2016. His Complaint states two constitutional counts (due process and equal protection) brought under 42 U.S.C. § 1983 and one Administrative Procedure Act claim. See Compl., ¶¶ 58-83. It asks the Court to reverse the Commission's rescission of Plaintiff's grant of parole (or, alternatively, to grant a parole rehearing with the right to appeal) and to declare that D.C. Code offenders have the right to appeal to the National Appeals Board (as federal offenders do). Id., Prayer for Relief, ¶¶ 1-2.

Still more has happened. Two months after the suit was filed, in September 2016, the Commission notified Hill that it would "[r]eopen and remand for a reconsideration hearing on the next available docket to determine whether the information presented at [the] special reconsideration hearing on July 25, 2012 was sufficient to deny parole pursuant to the statutory criteria set forth in D.C. Code § 24-404(a)." Mot., Exh. 12 (September 30, 2016, Notice of Action). In reviewing the case, the Commission's legal office found that it had "erred by failing to consider reasons other than offense accountability when denying the offender parole," as is "the Commission's policy with respect to D.C. Code offender[s]." Id., Exh. 2 (November 8, 2016, Hearing Summary) at 4 (citing 28 C.F.R. § 2.73); see 28 C.F.R. § 2.80(o)(4) (specifying effective Guidelines and policies). That is, the parole rescission had focused exclusively, and incorrectly, only on the circumstances of the murder. The Commission also let Plaintiff know

that it would "[n]otify victims of reconsideration hearing to be given an opportunity to present further testimony."  September 2016 Notice of Action.

In what would be another special reconsideration hearing convened in November 2016 — in effect, a fifth rehearing — an examiner heard testimony from Duncan's eldest daughter and two sisters, elicited statements by Hill himself (represented by an attorney), and received letters from the victim's son and uncle.  See 2016 Hearing Summary at 1-3.  After the proceedings, Hill submitted a written apology, and his brother sent in a letter of support.  Id. at 7.

This time, the witnesses gave more details, first about Plaintiff's relationship with Duncan.  Id. at 5 (noting "greater details of the events").  The victim's daughter first discussed how Hill had a history of attacking not only women but also children, including how he had "assaulted her by slamming her face into a mirror, beating her with a weight belt and busting her lip," and had abused her and her brother.  Id. at 1.  Duncan's sister described "how the offender repeatedly stalked" Duncan for a month before the murder and the "family's futile attempts to ensure her safety by closely monitoring the victim's departures and returns to her residence."  Id. at 2, 6.  The examiner also asked Plaintiff about a petition for a Civil Protection Order filed by Duncan, discovered by the Commission's staff, alleging that he "had attempted to suffocate her with a pillow."  Id. at 3, 5.  "[A]fter [he] choked her" on a separate occasion, in May 1987, Duncan apparently "broke[] off the relationship."  Id. at 6.  Hill testified that he "was under the influence of PCP when he committed the offense and did not provide any specific details regarding the actual murder."  Id. at 3.

In addition, Duncan's sister also testified how Hill's ex-wife (a different woman) was left "permanently disfigured" after a "brutal attack."  Id. at 2.  Plaintiff admitted that his prior convictions for Assault & Battery and Unlawful Wounding involved his "assaulting his ex-wife

by striking her in the face with the barrel of a pistol" and then shooting his mother-in-law after she attempted to intervene. Id. at 3; see id. at 6 (characterizing incident, somewhat differently, as "beating her with a rifle butt[,] shattering her face"). At the time, Hill had filed for divorce and was refusing to let his ex-wife interact with their daughter. Id. at 3.

The examiner recommended against parole. She discounted testimony that Hill had abused Duncan's children, as it lacked documentation. Id. at 5. But the examiner reasoned that, "[n]otwithstanding his [drug-abuse and anger-management] program participation, clear conduct[,] and current age and health, the offender's history of stalking his female victim [and] history of vicious assaults against his female paramours and their family make his release incompatible with public safety." Id. (finding Government's memorandum and Civil Protection "very persuasive and indicative of the offender's propensity for domestic violence"). The Commission agreed, noting again a "reasonable probability" that Hill would not obey the law and that release would "not [be] compatible with the welfare of society." Id., Exh. 13 (December 15, 2016, Notice of Action). It considered, in particular, his repeated stalking and threatening of Duncan, attempting to suffocate her with a pillow (leading to the Civil Protection Order), choking her, beating his ex-wife, and shooting his ex-wife's mother. Id. Given this "history of domestic violence," the USPC set a rehearing after Hill served two more years. Id.; see 2016 Hearing Summary at 5 (explaining two years, not five, warranted due to "age and health").

Once it made this decision, the Government filed the present Motion to Dismiss, which is now ripe.

## II.    Legal Standard

Under Rule 12(b)(1), the Court may dismiss a case if the plaintiff cannot show that it has subject-matter jurisdiction to hear his claims.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).  "Because subject-matter jurisdiction focuses on the court's power to hear the plaintiff's claim, a Rule 12(b)(1) motion [also] imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."  Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  In policing its jurisdictional borders, the Court must scrutinize the complaint, treating its factual allegations as true and granting the plaintiff the benefit of all reasonable inferences that can be derived from those facts.  See Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  The Court need not rely "on the complaint standing alone," however, but may also look to undisputed facts in the record or resolve disputed ones.  Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992).

Rule 12(b)(6), on the other hand, permits a Court to dismiss any count of a complaint that fails "to state a claim upon which relief can be granted."  In evaluating the motion, the Court must likewise "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (citation omitted).  The Court need not accept as true, however, "a legal conclusion couched as a factual allegation" or an inference unsupported by facts set forth in the Complaint.  Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Rule 12(b)(6)'s pleading standard is "not meant to impose a great burden upon a plaintiff," Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005), as a count will survive so long as there is a "'reasonably founded hope that the [discovery] process will reveal relevant evidence' to support the claim." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 563 n.8 (2007) (quoting Dura Pharm., 544 U.S. at 347). While "detailed factual allegations" are not necessary to withstand a dismissal motion, id. at 555, the Complaint still "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). In other words, a plaintiff must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A complaint may survive even if "'recovery is very remote and unlikely'" or the veracity of the claims are "doubtful in fact" if the factual matter alleged in the complaint is "enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555-56 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

### III. Analysis

No doubt the parole process has subjected Hill to his fair share of *sturm und drang*. Twice the Commission realized it was misapplying the parole Guidelines or using the wrong set, and once, notably, it set a release date before reversing course. To escape this endless cycle, Plaintiff brings two constitutional challenges under § 1983 (against the Commissioners) and an APA cause of action (against all Defendants).

In performing its analysis, the Court does not proceed count by count. As they often overlap, the suit is better considered via the three challenged aspects of Plaintiff's parole denial: (1) the lack of notice of the testimony of Duncan's family, (2) the absence of appeal rights to the National Appeals Board for D.C. Code offenders, and (3) the arbitrariness and unreasonableness

of rescinding his grant of parole.  Before addressing these issues sequentially, the Court takes

two detours and considers Defendants' sovereign immunity and the officers' potential liability

under § 1983.

A.  Sovereign Immunity

"Sovereign immunity is the privilege of the sovereign not to be sued without its consent."

Va. Office for Prot. & Advocacy v. Stewart, 563 U.S. 247, 253 (2011).  It shields "the federal

government, its agencies, and federal officials acting in their official capacities."  Am. Rd. &

Transp. Builders Ass'n v. EPA, 865 F. Supp. 2d 72, 79 (D.D.C. 2012), aff'd, 2013 WL 599474

(D.C. Cir. Jan. 28, 2013).  While Defendants embed only the slightest mention of the doctrine in

a block quote, see Mot. at 10, sovereign immunity is "'jurisdictional in nature' and may not be

waived by an agency's conduct of a lawsuit."  Perry Capital LLC v. Mnuchin, 848 F.3d 1072,

1099 (D.C. Cir. 2017) (quoting FDIC v. Meyer, 510 U.S. 471, 475 (1994)).  Here, Hill seeks

injunctive and declaratory relief against the Commission (a federal agency) and its three

Commissioners in their official capacities.  See Compl., ¶¶ 10-13.  While his APA claim names

each Defendant, his § 1983 counts are officer suits against the latter three only.  Id., ¶¶ 58-78.

A brief analysis confirms that immunity does not apply.  First and foremost, the APA's

statutory waiver permits individuals to sue both federal agencies and their officers for non-

monetary relief.  See 5 U.S.C. § 702.  This exception covers all of Plaintiff's claims.  See

Trudeau, 456 F.3d at 186 (holding waiver covers "any suit whether under the APA or not").

Second, more specific to the officer suits is the judicially crafted doctrine that "official-capacity

actions for prospective relief are not treated as actions against the State" and thus not subject to

immunity.  Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 n.10 (1989) (quoting Kentucky

v. Graham, 473 U.S. 159, 167 n.14 (1985)).  This principle thus protects, in an additional

manner, Hill's claims against the Commissioners.

The Government's central position appears to concern the invalidity of Hill's "claim

under 42 U.S.C. § 1983 against USPC," given a D.C. Circuit decision in Settles v. U.S. Parole

Commission, 429 F.3d 1098 (D.C. Cir. 2005).  See Reply at 3.  Yet, as just mentioned, there is

no such count against the Commission, only the officers.  This argument is thus moot.  No matter

how one looks at it, then, Plaintiff is safe at first base.

B.  Section 1983 Liability

But wait.  Even if Hill's suit against individual officers is not barred by sovereign

immunity, can federal officials be sued under § 1983 at all?  Indeed, the conventional wisdom is

that such claims should be brought under Bivens v. Six Unknown Named Agents, 403 U.S. 388

(1971), not § 1983.  See 1 Sheldon H. Nahmod, Civil Rights & Civil Liberties Litigation: The

Law of Section 1983 § 1:20 (2016) ("Section 1983 actions cannot ordinarily be maintained

against either the United States or its officials.").  The latter only permits suits against any

"person" acting "under color of any statute, ordinance, regulation, custom, or usage, of any State

or Territory or the District of Columbia."  42 U.S.C. § 1983.  For its purposes, "any Act of

Congress applicable exclusively to the District of Columbia shall be considered to be a statute of

the District of Columbia."  Id.  The Government thus seeks to dismiss the § 1983 counts outright

on the ground that the statute "cannot be used to proceed against employees of the federal

government, only against state officials."  Mot. at 9-10.  This statement, it turns out, is somewhat

overbroad.

While there is some initial awkwardness in treating federal officers as acting under color

of D.C. law, the conclusion is inescapable here.  As mentioned, the Revitalization Act

reorganized segments of the capital's government, resulting in the U.S. Parole Commission's stepping into the D.C. Board of Parole's shoes for the purposes of local parole. See Fletcher v. District of Columbia, 370 F.3d 1223, 1127 (D.C. Cir. 2004). Commissioners are thus "amenable to suit under § 1983 for actions taken pursuant to that Act." Settles, 429 F.3d at 1104 (quoting Fletcher, 370 F.3d at 1227). It would indeed be strange if they could not be sued, as they are fundamentally acting as the D.C. Board when applying D.C. parole standards to D.C. Code offenders. See 28 C.F.R. § 2.73(a) (citing D.C. Code § 24-404(a)). While Hill's case thus makes it to second base, he is still a long way from scoring. As it turns out, Plaintiff strikes out on each of his three merits arguments.

   C.  Lack of Notice

Plaintiff's opening bundle of substantive claims addresses the first, July 2012 special reconsideration hearing that followed his initial grant of parole in November 2011, but before its execution in August 2012. He contends that "USPC failed to provide sufficient notice reasonably calculated to inform Mr. Hill of the nature of the reconsideration hearing," as it did not let him know "the form and substance of the victim's family's testimony." Compl., ¶ 70. This purported lack of notice affected his seeking of legal representation, organizing of testimony, preparing of rebuttals, and securing of alternative release plans that would have satisfied the family's geographical concerns. Id., ¶¶ 71-72. Hill's challenge not only has a procedural-due-process gloss, but also implicates the APA. Id., ¶ 80.

Both due process and administrative law require that a person receive fair notice before certain hearings are held. See GE Co. v. EPA, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995). That notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."

Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950).  This means that "an agency setting a matter for hearing provide parties with adequate notice of the issues that would be considered, and ultimately resolved, at that hearing."  Wallaesa v. FAA, 824 F.3d 1071, 1083 (D.C. Cir. 2016) (quoting Pub. Serv. Comm'n of Ky. v. FERC, 397 F.3d 1004, 1012 (D.C. Cir. 2005)); see 5 U.S.C. § 554(b)(3) ("Persons entitled to notice of an agency hearing shall be timely informed of . . . the matters of fact and law asserted.").

This assertion of inadequate notice, however, falls flat.  First, Plaintiff's reliance on due process fails to travel far absent some protectable liberty interest.  See Trifax Corp. v. District of Columbia, 314 F.3d 641, 643 (D.C. Cir. 2003) (noting a "deprivation of liberty . . . triggers the procedural guarantees of the Due Process Clause").  Reasoning that a convicted person does not have a "'legitimate claim of entitlement'" to parole, the Supreme Court has held that there is "no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence."  Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 7 (1979) (quoting Board of Regents v. Roth, 408 U.S. 564, 577 (1972)).  And though "statutory language" can "create[] a protectible expectation of parole," id. at 11, the District's statutes and regulations lack the "explicitly mandatory language" necessary to form that expectation.  Ellis v. District of Columbia, 84 F.3d 1413, 1417 (D.C. Cir. 1996) (quoting Ky. Dep't of Corrections v. Thompson, 490 U.S. 454, 463 (1989)); accord Blair-Bey v. Quick, 151 F.3d 1036, 1048 (D.C. Cir. 1998); Price v. Barry, 53 F.3d 369, 370-71 (D.C. Cir. 1995); see McRae v. Hyman, 667 A.2d 1356, 1357 (D.C. 1995).  The D.C. Code instead instructs that "the Commission may authorize [a prisoner's] release on parole" if certain conditions are met.  See D.C. Code § 24-404(a) (emphasis added).  (And while substantive due process might apply to

parole decisions even absent such a protectable interest, see Blair-Bey, 151 F.3d at 1048 n.11, the Court saves discussion of that doctrine until Section III.E, *infra*.)

Nor did a protectable interest germinate from the initial grant of parole. While revoking parole for a person already released implicates due process, rescinding a parole grant prior to release violates "no protected 'liberty' interest." Jago v. Van Curen, 454 U.S. 14, 21 (1981); accord Rogers v. Barry, 107 F.3d 923 (D.C. Cir. 1997); Way v. Johnson, 893 F. Supp. 2d 15, 23 (D.D.C. 2012); Johnson v. United States, 590 F. Supp. 2d 101, 109 (D.D.C. 2008); Cole v. Harrison, 271 F. Supp. 2d 51, 53 (D.D.C. 2002); see Brown-Bey v. Hyman, 649 A.2d 8, 9 (D.C. 1994). Regulations indeed broadly provide that "the Commission may reopen any case for a special reconsideration hearing" to review "new and significant information concerning the prisoner." 28 C.F.R. § 2.75(e) (emphasis added). Further rules make clear that the front-end grant is not so determinate; a mere referral for reopening "shall automatically retard the prisoner's scheduled release date until a final decision is reached in the case." Id. § 2.28(f) (emphasis added). Indeed, the Commission makes clear to prisoners that the initial grant is only a "contingent" one, subject to the development of satisfactory release plans and agency approval. See January 2012 Notice of Action (citing 28 C.F.R. § 2.82); see also 28 C.F.R. § 2.83.

Second, and more broadly, both his due-process and APA objections to inadequate notice of victims' testimony are moot. See Compl., ¶¶ 70-72, 80. Hill alleges that he did not receive notice of what Duncan's family would say, but the relief he requests for this wrong is "a parole rehearing at the earliest possible date." Opp. at 10 (quoting Compl., Prayer for Relief, ¶ 1). Since a rehearing already occurred in November 2016, "it is impossible for a court to grant any effectual relief whatever to the prevailing party." Decker v. Nw. Envtl. Def. Ctr., 133 S. Ct. 1326, 1335 (2013) (quotation omitted). To recap, after this civil suit was filed, the Commission

again reopened the criminal case and informed Plaintiff in writing that it would "[n]otify victims of [the first] reconsideration hearing" to again give them "an opportunity to present further testimony." September 2016 Notice of Action. Given this statement and his knowledge of the Duncan family's intentions, he certainly has no claim that he lacked notice prior to the subsequent November 2016 rehearing that followed. See Moreau v. FERC, 982 F.2d 556, 569 (D.C. Cir. 1993) ("The Due Process Clause does not require notice where those claiming an entitlement to notice already knew the matters of which they might be notified."). In fact, Hill even obtained an attorney to assist him in the preparation for and conduct of that hearing. He has thus received complete procedural relief: a hearing with notice of who will testify and to what.

Plaintiff's only retort is that the November 2016 proceeding was not "a full parole rehearing," Opp. at 11, because its subject matter was limited to "whether the information presented at [the] special reconsideration [re]hearing on July 25, 2012 was sufficient to deny parole pursuant to the statutory criteria set forth in D.C. Code § 24-404(a)." September 2016 Notice of Action. While the negative language — *i.e.*, asking whether to "deny parole" — might suggest a narrower scope, a fairer reading of the record is that the Commissioners holistically reheard whether to grant parole under the cited D.C. Code eligibility criteria in light of the victims' testimony. This is indeed the issue that was explored, as the examiner broadly considered all the available evidence and testimony. See 2016 Hearing Summary at 1 (considering Hill's statements along with other witnesses). After all, the Commission's lacking of a reason to rescind parole functionally obtains the same result as its granting parole in the first place.

Seeing that due process does not apply and that Hill later received a new hearing, his constitutional and administrative claims of inadequate notice must be dismissed.

D.  Absence of Appeal Rights

Hill next challenges the lack of administrative-appeal rights for D.C. Code offenders like himself.  The absence of those rights, he believes, violates equal protection and the APA given that the Commission allows U.S. Code offenders, but not their D.C. counterparts, a layer of appeals, see Compl., ¶¶ 58-67, 83, and also renders the hearing system procedurally inadequate. Id., ¶¶ 76-77.  The Court examines the Commission's role in federal and District cases before addressing these two contentions.

1.  *U.S. Code vs. D.C. Code Parole Processes*

Let's start with the federal system.  "For almost a century, the Federal Government employed in criminal cases a system of indeterminate sentencing" — a term of imprisonment of variable duration — which "was supplemented by the utilization of parole, by which an offender was returned to society under the 'guidance and control' of a parole officer." Mistretta v. United States, 488 U.S. 361, 363 (1989) (quoting Zerbst v. Kidwell, 304 U.S. 359, 363 (1938)).  That process was overseen by the Commission.  See 18 U.S.C. § 4201 *et seq.*

This system was, for the most part, eliminated by the Sentencing Reform Act of 1984, 18 U.S.C. § 3551 *et seq.*, which made "all sentences basically determinate" and "prospectively abolish[ed] the Parole Commission." Mistretta, 488 U.S. at 367.  The Commission now manages only those individuals convicted of federal offenses on or before November 1, 1987.  See Chatman-Bey v. Thornburgh, 864 F.2d 804, 808 n.3 (D.C. Cir. 1988).

For such federal offenders, parole decisions follow a three-step process.  Ordinarily, an examiner first conducts a hearing and makes a recommendation, see 28 C.F.R. §§ 2.13, 2.14, 2.23; a single Commissioner may then adopt that recommendation (or reject it after obtaining another Commissioner's concurrence), id § 2.24; and finally, either party (the inmate or the

Government) may appeal to the National Appeals Board, which is simply the three-member Commission acting on a majority vote. Id., §§ 2.1(c), 2.26.

Just like the feds, the District has shifted to a determinate scheme. The city largely abandoned indeterminate sentencing and parole with the Revitalization Act. See Void v. U.S. Parole Comm'n, No. 12-978, 2012 WL 6633850, at *1 n.1 (D.D.C. Dec. 20, 2012); see also D.C. Code § 24-403.01(c) (requiring "definite term" sentences in most cases). That Act was also passed to "relieve the district government of major financial and managerial responsibilities . . . [and] help the city resolve its cash shortfall that stems from its accumulated deficit." Banner v. United States, 303 F. Supp. 2d 1, 6 n.3 (D.D.C. 2004). To further that purpose, the District "transfer[red] . . . parole authority over felony offenders convicted in Superior Court from the D.C. Board to the U.S. Commission." Gant v. Reilly, 224 F. Supp. 2d 26, 34 (D.D.C. 2002); see D.C. Code § 24-131(a)(1), (a)(2), (b). As a result, the Commission now handles primarily those D.C. Code felony offenders (like Hill) convicted before 2000.

Parole for these inmates typically has only two steps. The process also starts with an initial hearing by an examiner, see 28 C.F.R. § 2.72(a), but then the case proceeds directly to the full Commission for a majority vote. Id. § 2.74(a), (c). The USPC installed this procedure to "replicate the voting procedures of the former DC Board." Paroling, Recommitting, and Supervising Federal Prisoners: Prisoners Serving Sentences Under the United States and District of Columbia Codes, 69 Fed. Reg. 68,791, 68,791 (Nov. 26, 2004); see Sellmon v. Reilly, 551 F. Supp. 2d 66, 68 (D.D.C. 2008) (stating that Revitalization Act, § 11231(c), directed Commission to follow "parole laws and regulations of the District of Columbia").

There is one wrinkle. In 2004, the Commission modified its process for parole-revocation decisions — i.e., for parolees who had already been released. In those cases, the

Commission decided to make the procedures for D.C. Code offenders essentially coterminous with U.S. Code offenders.  See 69 Fed. Reg. at 68,791-92; see 28 C.F.R. § 2.105(c), (g).  It explicitly declined to extend federal procedures to D.C. Code offenders still incarcerated, however, opting instead for "an incremental approach," given the agency's "[b]udget constraints and the availability of sufficient staff and Commissioners to handle the appeals."  69 Fed. Reg. at 68,792.

## 2. *Disparate Appeal Rights*

Plaintiff objects to this schema insofar as the Commission permits an administrative appeal to the National Appeals Board for U.S. Code, but not D.C. Code, offenders.  See Opp. at 11, 18.  He alleges that this disparate treatment violates equal protection and thus also runs afoul of the APA.  See Compl., ¶¶ 61-67, 82.  "To prevail on an equal protection claim, the plaintiff must show that the government has treated it differently from a similarly situated party and that the government's explanation for the differing treatment does not satisfy the relevant level of scrutiny."  Cannon v. District of Columbia, 717 F.3d 200, 207 (D.C. Cir. 2013) (quoting Muwekma Ohlone Tribe v. Salazar, 708 F.3d 209, 215 (D.C. Cir. 2013)).  Hill not only misconstrues how the two systems differ, but also falters on both equal-protection elements.

## a. Framing the Claims

An initial fog slows Plaintiff's sailing.  Hill states that "D.C. Code offenders cannot appeal USPC parole decisions to any administrative adjudicatory body, while U.S. Code offenders can appeal USPC parole decisions to the National Appeals Board."  Compl., ¶ 64.  The federal offender's appeal to the National Appeals Board may sound somewhat majestic, but that stately façade crumbles on inspection.  The NAB is the three-member Commission, and local offenders also have their cases heard by that Commission.  See 28 C.F.R. §§ 2.1(c), 2.74.  In

other words, despite Hill's assertion that he lacks an avenue to the "National Appeals Board," the final adjudicatory stage for both U.S. and D.C. offenders is essentially the same three-person body acting on a majority vote. Compare id. § 2.26(b)(1) (requiring, federally, "concurrence of two Commissioners"), with id. § 2.74(c) (requiring, locally, "concurrence of two Commissioners").

Whatever disparity exists instead lies in the fact that U.S. Code offenders have the right to an intermediate decision by a single Commissioner (sometimes two Commissioners) before proceeding to the three-member Commission. D.C. Code offenders have only the direct right to a final decision by the Commission as a whole. Id. § 2.74. Plaintiff, however, barely addresses how this extra buffer is procedurally meaningful. He suggests in a footnote only that it results in a "more robust, detached appeal process [for] federal offenders," presumably by adding an intermediate opportunity to obtain a favorable parole decision (should the Government also not appeal). See Opp. at 12 n.1; see also 28 C.F.R. § 2.26(f). The Complaint, however, does not even allege that the inequality is the lack of this middle procedural step.

b. Similarly Situated

Even if Hill had more persuasively set forth the federal-local parole-process disparity, his equal-protection ship would still run aground. This is because D.C. Code offenders are not similarly situated to their U.S. Code counterparts in the first place. "The Constitution does not require [individuals] wh[o] are different in fact or opinion to be treated in law as though they were the same." Tigner v. Texas, 310 U.S. 141, 147 (1940). States may no doubt set up their own unique parole systems without triggering equal-protection concerns. See United States v. Greene, 489 F.2d 1145, 1151 (D.C. Cir. 1973) (noting that "[c]ertainly there would be no constitutional objection" if, "say, Virginia" defined first-degree murder differently from the

District); see also Clements v. Fashing, 457 U.S. 957, 962-63 (1982) (noting states' "considerable leeway").  Although the District's governance makes it a bit of a constitutional oddity, there is no reason to believe that the city may not be subjected to different rules than the federal government.

It does not matter, for equal-protection purposes, that a single federal Commission fashions two sets of parole rules.  When it comes to legislative authority, this Circuit "has been at pains to point out that 'Congress . . . recognized the expediency of separate provisions' pertaining to criminal justice applicable exclusively to the District of Columbia in contradistinction to the [U.S.] Criminal Code governing offenses amenable to federal jurisdiction elsewhere."  Coleman v. United States, 334 F.2d 558, 566 (D.C. Cir. 1964) (quoting Johnson v. United States, 225 U.S. 405, 418 (1912)); see, e.g., Greene, 489 F.2d at 1151 ("Congress was not limited in the D.C. Code specification for first degree felony murder to the felonies set forth in the Federal Code . . . .").  After all, Congress plays a wholly separate role when enacting legislation locally as opposed to federally.  See U.S. Const., art. I, § 8, cl. 17; Banner v. United States, 303 F. Supp. 2d 1, 16 (D.D.C. 2004) ("When Congress legislates for the District, therefore, the differing treatment is the consequence not of legislative determinations but of constitutional distinctions . . . .") (quotation omitted).  It follows that Congress has separately delegated to the Commission rulemaking powers for each jurisdiction.

A quick peek at the respective local and federal laws confirms this.  When acting for D.C. Code offenders, the Commission expressly wields the authority of local law.  See D.C. Code § 24-131.  When acting for U.S. Code offenders, conversely, it is empowered by federal law. See 18 U.S.C. § 4202.  In other words, Hill was sentenced and seeks parole under the substantive provisions of the D.C. Code, and federal offenders are sentenced and seek parole under the

substantive provisions of the U.S. Code.  Compare D.C. Code § 24-404, with 18 U.S.C. § 4206.

Plaintiff, simply put, does not receive the federal treatment because he is not a federal offender.

It would indeed be anomalous if the mere fact of a single Commission for both local and federal offenders rendered the two groups similarly situated.  Before the Revitalization Act abolished the D.C. Board of Parole, this Circuit had reasoned that a D.C. prisoner "is not similarly situated to [federal] prisoners, because he is in the custody of a different agency of government."  Noble v. U.S. Parole Comm'n, 194 F.3d 152, 154-55 (D.C. Cir. 1999).  Two decades ago, Hill would have utterly lacked a claim.  He is essentially arguing that this mere change in form — from Board to Commission — has far-reaching constitutional ramifications.

The legality of this setup was effectively decided in United States v. Cohen, 733 F.2d 128 (D.C. Cir. 1984) (en banc) (Scalia, J.).  That case asked whether Congress could — through D.C. Code § 24-301 — require the federal judiciary to automatically commit individuals acquitted by reason of insanity in the District while not providing a mechanism to do so nationally.  Id. at 129-32.  In disposing of the case, the court noted that federal offenders "would not constitute a proper reference class for equal protection purposes" when Congress enacted special local law.  Id. at 137 n.15; see id. at 142 (Mikva, J., concurring) ("Individuals within and without the District of Columbia are not similarly situated with respect to congressional legislation enacted in Congress' role as local sovereign.").  Cohen thus stands for the proposition that District offenders cannot be counted as so similar as to implicate equal-protection concerns.

c.  Rational Basis

Hill's equal-protection vessel also founders on a final reef.  The disparate treatment of federal and local offenders is unlawful only if the distinction lacks a rational basis.  See Noble, 194 F.3d at 154.  "The general rule is that legislation is presumed to be valid and will be

sustained if the classification drawn by the statute is rationally related to a legitimate state interest." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985). Such a rational basis is not hard to find here.

In considering disparities between District and federal law, the Circuit has stated that "[a]chieving a particular legislative goal through the exercise of a single legislative authority is almost the paradigm of the 'one step at a time' approach . . . and has been the basis for the evolution of much of our law." Cohen, 733 F.2d at 138 (quoting Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 489 (1977)). The Commission likewise can choose to extend privileges slowly, granting them to some but not others, in an effort to enact gradual reform. See Williamson, 348 U.S. at 489 (stating that reform may "address[] itself to the phase of the problem which seems most acute . . . [and] select one phase of one field and apply a remedy there, neglecting the others").

Exactly that seems to be what has been happening. After the Revitalization Act first passed, the Commission sought to "replicate the voting procedures of the former DC Board." 69 Fed. Reg. at 68,791. That makes some sense. Those procedures had already been in place for D.C. Code offenders, and the Commission saw no need to upset the status quo. It so decided because "the USPC does not have the staff resources at the present time to process a full caseload of appeals from D.C. Code inmates along the same lines as appeals from federal inmates." Paroling, Recommitting, and Supervising Federal Prisoners: Prisoners Serving Sentences Under the District of Columbia Code, 65 Fed. Reg. 45,885, 45,886 (July 26, 2000). In rejecting the addition of an intermediate step, it noted the initial parole determination in the District was already fairly robust. Id. (comparing, locally, "a concurrence of at least two Commissioners" with, federally, "a single Commissioner").

The Commission has since weighed whether to expand the process. In 2004, it added an appeals layer for parole-revocation decisions for District offenders. See 69 Fed. Reg. at 68,791. In doing so, it noted the importance of being "careful in apportioning its workload among the Commissioners so as to avoid violations of decision-making time limits." Id. at 68,792. But the Commission limited the new procedures to revocation decisions, as it was "continuing to employ an incremental approach in making appeals available to DC offenders and in modifying the agency's voting procedures." Id. As the agency reasoned: "The Commission wants to see the results of the changes made by these amendments before making any further modifications. Budget constraints and the availability of sufficient staff and Commissioners to handle the appeals are factors that affect the Commission's ability to expand or maintain an appeal procedure." Id.

The incremental, rational narrative is easy to plot. The Commission long used a three-step process for federal offenders. With the addition of District offenders to the agency's docket, it chose to wield its rulemaking power gradually, at first mirroring the D.C. Board of Parole's old procedures and then by offering new ones where it could. As these documented fiscal concerns are quintessential reasons for proceeding piecemeal, the Court concludes that the procedures thus derive from a rational root. See Harris v. Rosario, 446 U.S. 651, 652 (1980) (noting budgetary considerations as rational basis).

### 3. *Inadequate Procedures*

Aside from his equal-protection claim, Hill also attacks the Commission's District procedures as, in themselves, inadequate. See Compl., ¶ 76-77. He asserts cursorily, without reference to any due-process law, that "[f]ew procedural rights are as precious as the right to appeal." Opp. at 14.

On the contrary, there is nothing sacrosanct about administrative appeals. Even in criminal cases, the Supreme Court "has never . . . required . . . avenues of appellate review." Rinaldi v. Yeager, 384 U.S. 305, 310 (1966). This is especially so with parole because due process is not even implicated absent a protected interest. See *supra* Section III.C. The exact "procedure to ascertain [parole], as well as the kind or amount of evidence upon which to base its determination" "is a question of state policy exclusively for the state to decide." Ughbanks v. Armstrong, 208 U.S. 481, 488 (1908). In the District, by analogy, it is a matter solely of congressional discretion.

Imposing additional procedures "in the name of due process [is] therefore unwarranted." Ellis, 84 F.3d at 1420. Similarly, the mere fact that the Government has chosen to set up a hearing system does not mean that it must also provide for an added layer of administrative review to make that process fair. See Franklin v. District of Columbia, 163 F.3d 625, 634 (D.C. Cir. 1998) (rejecting that due process applies simply because there are hearings). In short, no further process is required.

E.  Arbitrary & Unreasonable Rescission

The final sliver of this case involves Plaintiff's substantive-due-process and APA challenges, which assert that "[t]he reasons cited by the USPC in rescinding Mr. Hill's parole at his reconsideration hearing failed to justify that rescission," "USPC's rescission of parole was arbitrary and unreasonable," and the agency "fail[ed] to rely on new or significant adverse information in rescinding Mr. Hill's parole." Compl., ¶¶ 73-74, 80; see Opp. at 16 (citing Blair-Bey, 151 F.3d at 1048 n.11 ("There is some authority for the proposition that exceptionally arbitrary governmental conduct may in itself violate the due process clause, whether or not a liberty or property interest is at stake")). As relief, he asks the Court to "revers[e] the August 29,

2012 Notice of Action rescinding Mr. Hill's grant of parole and reinstat[e] Mr. Hill's parole." Compl., Prayer for Relief, ¶ 1.

To be sure, Hill's cause could elicit a modicum of sympathy. While he committed a heinous murder and the Commission most recently found that there was a reasonable probability that he would reoffend and jeopardize societal welfare, it appears undisputed that he has suffered from various medical ailments (diabetes, back problems that resulted in surgery, stroke) that require him to use a wheelchair or walker to move around. See 2016 Hearing Summary at 2, 5; 2015 Letter from Fiebig at 4. He has also racked up no prison disciplinary record and completed educational and rehabilitative programs, and, of course, the Commission once thought him fit for release.

The Government seemingly only seeks to dismantle Hill's APA count — and omits any mention of substantive due process — by arguing that its decisions are so discretionary as to be unreviewable. See Mot. at 15-16; Reply at 7-8; see also 5 U.S.C. § 701(a)(2). That may be so for D.C. Code offenders. See generally 18 U.S.C. § 4218(d) (committing to agency discretion certain actions for U.S. Code offenders under § 4203(b)(1)-(3)). But there is another reason why the Court cannot review Hill's claims. Whether they arise under § 1983 or the APA, counts seeking early release must be brought as a petition for a writ of habeas corpus.

"[P]risoner cases challenging the 'fact or duration' of confinement . . . sound exclusively in habeas." Anyanwutaku v. Moore, 151 F.3d 1053, 1055 (D.C. Cir. 1998) (quoting Preiser v. Rodriguez, 411 U.S. 475, 500 (1973)). A federal prisoner must bring a habeas petition if and "only if success on the merits will 'necessarily imply the invalidity of confinement or shorten its duration." Davis v. U.S. Sentencing Comm'n, 716 F.3d 660, 666 (D.C. Cir. 2013) (quoting Wilkinson v. Dotson, 544 U.S. 74, 82 (2005)). While claims seeking further procedures (notice

and a rehearing or an administrative appeal) would not necessarily lead to freedom, see Ray v. Smoot, 168 F. Supp. 3d 111, 112-13 (D.D.C. 2016), Hill's challenges to the rescission itself would "automatically result in[] a speedier release from prison." Anyanwutaku, 151 F.3d at 1056.

It is not difficult to see how this is so. Hill essentially contends that the Commission lacked any justification for rescinding his parole and thus acted arbitrarily and unreasonably. See Compl., ¶¶ 73-74, 80. But if it lacks cause to rescind parole, then it must grant parole. The remedy he seeks is thus to reverse the rescission and reinstate his release. Id., Prayer for Relief, ¶ 1. Although the Commission could again seek rescission even if the Court granted this relief, this vague future possibility matters not in the habeas calculus. See Dotson, 544 U.S. at 83 (holding that "the fact that the State may seek a new judgment (through a new trial or a new sentencing proceeding) is beside the point"). Absent further Government action, nullifying the rescission would spell Hill's release.

Circuit precedents essentially confirm this. The very case that opened the door to a substantive-due-process claim for arbitrary governmental conduct in parole cases noted that the proper avenue was habeas. Blair-Bey, 151 F.3d at 1039. The fact that Hill's claim is brought under the guise of § 1983 does not change this fact. See Preiser, 411 U.S. at 489 (holding habeas also displaces § 1983). As to the APA, a prisoner may bring a broad-based objection, claiming, for instance, "that parole officials are apt to use incorrect rules when resolving a future application." Richmond v. Scibana, 387 F.3d 602, 605 (7th Cir. 2004) (emphasis added); see, e.g., Settles, 429 F.3d at 1108-09 (considering APA challenge to Commission's rulemaking). But any APA action to overturn a particular parole decision on essentially "abuse of discretion" grounds must be brought under habeas. Wallace v. Christensen, 802 F.2d 1539, 1550 (9th Cir.

1986); see, e.g., Bethea v. Bureau of Prisons, No. 04-2269, 2005 WL 3244195, at *2 (D.D.C. Nov. 30, 2005) (treating claim as one falling under habeas); Cole v. Harrison, 271 F. Supp. 2d 51, 53 (D.D.C. 2002) (same); see also Cole v. Fulwood, 879 F. Supp. 2d 60, 68 (D.D.C. 2012) (noting "several cases in which courts have reviewed USPC decisions for abuse of discretion in *habeas corpus* cases, but none in which the same was done under the APA").  As Hill challenges, in effect, the Commission's substantive decision to rescind his parole, he must instead seek the writ.

Habeas has its own parameters.  It involves jurisdictional and statutory limitations, including naming the prisoner's custodian as the proper defendant (likely the warden of the Federal Correctional Institution in Butner, North Carolina) and filing in the proper court (likely the U.S. District Court for the Eastern District of North Carolina).  See Thomas v. Fulwood, 128 F. Supp. 3d 341, 345-46 (D.D.C. 2015) (citing Rumsfeld v. Padilla, 542 U.S. 426 (2004); Braden v. 30th Judicial Cir. Ct. of Ky., 410 U.S. 484 (1973); Stokes v. U.S. Parole Comm'n, 374 F.3d 1235 (D.C. Cir. 2004)).  As none of these requirements seems satisfied here, the Court will not address the merits of whether the Commission acted arbitrarily or unreasonably and instead will dismiss the claims without prejudice.

## IV.   Conclusion

For these reasons, the Court will grant Defendants' Motion to Dismiss.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  June 2, 2017